UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ANTHONY J. BROADWATER,

                Plaintiff,

   -against-

THE COUNTY OF ONONDAGA; THE CITY
OF SYRACUSE; Assistant District Attorney
GAIL UEBELHOER, in her individual
capacity; Syracuse Police Department Detective
GEORGE LORENZ, in his individual capacity,
and JOHN DOES 1-5, names and numbers of
whom are yet to be determined,

                Defendants.

22 Civ. ___

**COMPLAINT AND JURY
DEMAND**
Case No.: 5:22-CV-1241 (BKS/TWD)

Plaintiff ANTHONY J. BROADWATER, by and through his counsel, Emery Celli

Brinckerhoff Abady Ward & Maazel LLP, Carden Dotzler Hammond, PLLC, and Melissa

Swartz, Esq., respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.      Anthony J. Broadwater spent more than sixteen years in prison for a crime he did

not commit: the brutal, widely publicized sexual assault of ████████, a then-18-year-old

Syracuse University freshman.

2.      Mr. Broadwater was 21 years old on the date of his arrest. He did not regain his

freedom until after his 38th birthday.

3.      Mr. Broadwater lost two decades of his life behind bars not because he did

something wrong, but because of police and prosecutorial misconduct committed by Defendants

Detective George Lorenz, Assistant District Attorney Gail Uebelhoer, and John Does 1-5.

4.      The case against Mr. Broadwater rested primarily on ████ ██ in-court identification of Mr. Broadwater at trial.

5.      Defendants Lorenz and Uebelhoer improperly procured ███ ███ in-court identification by making false and highly suggestive representations to her to wrongly implicate Mr. Broadwater after she identified another man—not Mr. Broadwater—as the perpetrator in a lineup.

6.      After the lineup, Detective Lorenz raised ███ ███ suspicion that she may have picked the wrong person. He approached her looking "downcast," and told her, "you were in a hurry to get out of there," even though ██ ██ had spent several minutes carefully examining the lineup and expressed no doubt or uncertainty of her identification of a different man when she made it.

7.      Defendant Uebelhoer then falsely told ██ ██ that Plaintiff had rigged the lineup with a "friend" who was a "dead ringer" for him, which was completely untrue. Mr. Broadwater did not rig the lineup; the man ██ ██ identified was not Mr. Broadwater's friend; and Defendant Uebelhoer made a note that Mr. Broadwater and the man ██ ██ identified had distinct features immediately before the lineup.

8.      Detective Lorenz did nothing while Defendant Uebelhoer tainted ██ ███ He did not end the conversation, did not document it in any police report or sworn statement, and did not disclose it to anyone, including Mr. Broadwater or his defense attorney, as Mr. Broadwater's prosecution progressed.

9.      Neither Mr. Broadwater nor his defense counsel were present during this conversation, and Defendants Lorenz and Uebelhoer never disclosed it to them. As a result of Defendants' misconduct, Mr. Broadwater lost the opportunity to cross-examine ██ ██

about Defendants' false and highly suggestive statements to her that led her to identify Mr. Broadwater in court.

10.     Mr. Broadwater has maintained his innocence ever since his conviction. Only by a series of miraculous events four decades after his conviction was it revealed that Mr. Broadwater's conviction was procured by Defendants' egregious misconduct resulting in a mistaken cross-racial identification.

11.     On November 22, 2021, the Supreme Court for the State of New York, Onondaga County, granted Mr. Broadwater's motion to vacate the conviction and dismiss the indictment. On the record, the court specifically cited the tainted and improperly procured identification when it vacated the conviction.

12.     Mr. Broadwater's unjust conviction was so readily apparent that the current Onondaga County District Attorney, William J. Fitzpatrick, joined in Mr. Broadwater's motion to vacate the conviction and dismiss the indictment. He personally attended the hearing and apologized to Mr. Broadwater on the record: "This should never have happened. And I will say to Mr. Broadwater that I assure him that it will never happen again."

13.     This is a civil action under 42 U.S.C § 1983, the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and New York law. This action seeks monetary damages for Mr. Broadwater's malicious criminal prosecution, wrongful conviction, and false imprisonment due to violation of his fundamental federal constitutional rights.

**JURY DEMAND**

14.     Plaintiff demands a trial by jury in this action.

## JURISDICTION AND VENUE

15.     This Court has original subject matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because Plaintiff's claims arise under a law of the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation, under color of State law, of rights guaranteed by the United States Constitution.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

17.     Plaintiff has complied with the requirements of New York General Municipal Law Section 50-i by serving notices of claim on the Onondaga County Law Department and City of Syracuse Law Department on February 14, 2022. More than 30 days have elapsed since Plaintiff served those notices of claim and no offer of settlement has been made.

18.     Plaintiff submitted to a hearing pursuant to New York General Municipal Law 50-h on June 10, 2022.

19.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiff's claims arose in this judicial district.

## PARTIES

20.     Plaintiff Anthony J. Broadwater is a citizen of the State of New York, residing in Onondaga County.

21.     Defendant City of Syracuse is a municipal corporation existing by virtue of the laws of the State of New York.

22.     Defendant County of Onondaga is a municipal corporation existing by virtue of the laws of the State of New York.

23.    Defendants City of Syracuse and County of Onondaga shall be collectively referred to herein as the "Municipal Defendants."

24.    Defendant George Lorenz was at all relevant times a detective employed by the Syracuse Police Department ("SPD"). He is named in his individual capacity.

25.    Defendant Gail Uebelhoer was at all relevant times an employee of Defendant County of Onondaga in the Onondaga County District Attorney's Office. She is named here in her individual capacity.

26.    Defendants John Does 1-5 were at all relevant times employees of Defendant SPD. They are named in their individual capacity.

27.    Defendants Lorenz, Uebelhoer, and Does 1-5 shall be referred to collectively herein as the "Individual Defendants."

**FACTS**

**I.    The Rape of ▮▮▮▮▮**

28.    In the early morning hours of May 8, 1981, someone brutally assaulted and raped Syracuse University freshman ▮▮ ▮▮ in Thornden Park. ▮▮ promptly reported the offense to police that morning. In a May 1981 affidavit, she described the perpetrator as "a negro approx. 16-18 yrs. of age, small and muscular build of 150 lbs., wearing dark blue sweatshirt and dark jeans, with short afro-style hair cut."

**II.    Mr. Broadwater Is Arrested in October 1981**

29.    On October 5, 1981, nearly five months after the assault, ▮▮ ▮▮ walked by Plaintiff, Mr. Broadwater, on Marshall Street in Syracuse. ▮▮ ▮▮ mistakenly believed Mr. Broadwater was the man who had raped her, and she reported this encounter to the police. She provided a second affidavit claiming she "had a felling [sic] that the black male might be the

5

person that raped me last May in Thornden Park." She also said the man had been speaking with a police officer when she encountered him.

30.     ████████ provided police a sketch and a description, much more detailed than her original description from May, of the man on Marshall Street who reminded her of her rapist:

> The suspect is a Black Male, 5'5"-5'7", 165-175 lbs very stockily built, very muscular looking with short cropped hair that was down in the front, a pug nose but wider than most blacks. The eyes were almond shaped almost Oriental, the mouth of the suspect had thick bottom lip and a thin upper lip the mouth was longer than most but not unusually long. The suspects [sic] Face Structure was a short neck w/ a small but thick skull, with a boxy jawline, the suspect's complexion was dark but not too dark.

31.     The SPD thereafter broadcasted a general message bulletin providing a description of the suspect and that he had been speaking with an officer on Marshall Street. An officer immediately responded stating that he had spoken to Mr. Broadwater on Marshall Street. The officer who sent the bulletin then wrote that "arrest is imminent" and that Mr. Broadwater should be "considered armed and dangerous."

32.     On October 14, 1981, police arrested and charged Mr. Broadwater with ████ ████████ rape. He was assigned counsel and categorically denied the offense. Mr. Broadwater, like many Black men in Syracuse, generally fit the second description provided by ████ ████. At the time of the offense, however, Mr. Broadwater had a chipped front tooth, a scar between his eyebrows, and a scar on his chin. ████ ████ did not note any of these unique characteristics in her May or October descriptions of the perpetrator.

33.     Defendant Detective Lorenz was assigned as the lead detective on the case.

**III.      █████   Identifies a Different Man in a Lineup**

34.     After his arrest, Mr. Broadwater "insisted on a lineup procedure," according to a note in the case file by Defendant ADA Uebelhoer.

35.     On November 4, 1981, Mr. Broadwater voluntarily participated in a police-arranged lineup procedure. Mr. Broadwater's defense counsel attended the lineup.

36.     Defendant Detective Lorenz and ADA Uebelhoer were both present at the lineup.

37.     Upon reviewing the proposed lineup, Mr. Broadwater and his attorney had concerns about its fairness. They requested that one of the fillers, who did not match █████ ██████ description, be substituted by another individual who had been in the holding cell with Mr. Broadwater that day. The jail personnel retrieved the individual identified by Mr. Broadwater, and Mr. Broadwater's attorney placed him in position number five.

38.     Apparently believing that person number five did not look like Mr. Broadwater, ADA Uebelhoer noted for the record that person number five had facial hair. Police positioned Mr. Broadwater as person number four.

39.     █████ entered the lineup viewing room and spent five minutes examining each individual. At one point during her five-minute examination, she asked all of the men to turn to the left.

40.     █████ then identified person number five as the person who had raped her back in May 1981. She appeared sure of her choice, showing "no doubt or concern" nor "any belief that this selection she was making was tentative or laced with uncertainty," according to Mr. Broadwater's attorney. She signed and dated the form provided to her stating that person number five was her rapist.

IV.    **After the Lineup, Detective Lorenz and ADA Uebelhoer Make False and Suggestive Statements to ▮▮ to Improperly Implicate Mr. Broadwater**

41.    After the lineup, ▮▮ entered a separate conference room. Detective Lorenz was the first person to enter the conference room after ▮▮.

42.    According to ▮▮, Detective Lorenz looked "downcast" when he walked in. ▮▮ took his cue, asking, "it was four, wasn't it?"

43.    Detective Lorenz improperly and in violation of the law confirmed that she had picked the wrong person by responding, "You were in a hurry to get out of there."

44.    Defendant ADA Uebelhoer then entered the room "angry," according to ▮▮. "Well we got the hair out of the bastard," she said.

45.    ▮▮ told ADA Uebelhoer that "Officer Lorenz told me I chose the wrong one." Detective Lorenz then told ADA Uebelhoer that ▮▮ "thinks it was four."

46.    ADA Uebelhoer turned to ▮▮ and said, "Of course you chose the wrong one . . .  He and his attorney worked to make sure you'd never have a chance."

47.    Detective Lorenz did not correct the false statement by ADA Uebelhoer and failed to document and memorialize this conversation. He sat idly by as ADA Uebelhoer tainted the witness.

48.    ADA Uebelhoer then stated, falsely, that Mr. Broadwater "had his friend come down and stand next to him. We had to send a car to the prison to get him here. They wouldn't go ahead until he showed . . . They really worked a number on you. He uses that friend, or that friend uses him, in every lineup they do. They're dead ringers."

49.    ADA Ubelhoer's proclamation that these two Black men were "dead ringers" conflicted with her statement moments before, that facial hair made them easily distinguishable.

50.     As ADA Uebelhoer continued to make these false statements, Detective Lorenz again did nothing to stop ADA Uebelhoer and again did not document what he witnessed. Nor did he ever report ADA Uebelhoer's false, misleading, and improper statements, whose only purpose was to lead ███ ████ to falsely identify Plaintiff as her rapist.

51.     ADA Uebelhoer next speculated that person number five purposefully looked scary to "psyche her out" while Mr. Broadwater looked innocently downward. This, ADA Uebelhoer told ███ █████, was a carefully orchestrated trick to dissuade ███ ████ from choosing the correct person in the lineup. ADA Uebelhoer told ███ ████ that she objected to person number five because he and Mr. Broadwater looked too much alike, even though she had previously noted that person number five looked dissimilar to Mr. Broadwater because of his facial hair.

52.     Detective Lorenz participated in this improper conversation and he purposefully omitted the substance of it from his sworn police report. He never reported it to anyone.

53.     Neither Mr. Broadwater nor his attorney were present throughout this conversation between Detective Lorenz, ADA Uebelhoer, and ███ ████.

54.     Neither Defendant Lorenz nor Defendant Uebelhoer reported this conversation to Plaintiff or his defense attorney.

55.     Nor is there any contemporaneous documentary record of this conversation. It first came to light in ███ ████ 1999 memoir, *Lucky*, published seventeen years after Mr. Broadwater's trial and conviction.

## V.    Defendants Lorenz and Does 1-5 Failed to Disclose Pattern Rapes in Thornden Park Within the Same Year as ███ █████ Rape

56.     Between June 1980 and August 1981, all within one year of ███ ████ rape in May 1981, there were four other rapes of young White women ages 16-27 reported in Thornden

9

Park by Black men of a generally similar height and build as the description ███ ███ gave to the police in May 1981.

57.     Upon information and belief, the SPD, including Defendant Detective George Lorenz and Defendant John Does 1-5, were aware of these rapes.

58.     Defendants Lorenz and Does 1-5 failed to disclose this information to Plaintiff and his defense attorney.

59.     It was not until the reinvestigation of this case in 2021 that District Attorney William Fitzpatrick became aware of the rapes that were part of the police department file.

**VI.    Mr. Broadwater Is Convicted at Trial Based on ███ ███ Belated, Improperly Obtained Identification and a Subsequently Debunked Microscopic Hair Analysis**

60.     On November 17, 1981, Mr. Broadwater was indicted on eight counts, including Rape in the First Degree.

61.     In May 1982, the case proceeded to trial. Mr. Broadwater elected a bench trial before Judge Walter Gorman.

62.     ADA William Mastine was the lead prosecutor on the case and presented the case and questioned the witnesses.

63.     Defendant Detective Lorenz never informed ADA Mastine about the improper conversation that took place after the lineup.

64.     The trial lasted two days.

65.     The only evidence connecting Mr. Broadwater to the rape presented at trial was ███ ███ belated and improperly procured cross-racial in-court identification, along with faulty testimony from microscopic hair analyst Stephen Kaszubinski.

66.     At trial, ███ ███ identified Mr. Broadwater as the person who raped her for the first time since she saw Mr. Broadwater on Marshall Street eight months earlier. Making an in-

court identification of Mr. Broadwater was easy since he was the only Black person in the courtroom that day.

67.     Even though Mr. Broadwater's counsel questioned ████ ████ on the identification of person number five as her rapist at the lineup, he could not cross-examine her about the improper post-identification conversation between ████ ████, ADA Uebelhoer, and Detective Lorenz because ADA Uebelhoer never disclosed that conversation to defense counsel and Detective Lorenz did not document it in any police report or report it to ADA Mastine, the trial ADA.

68.     In summation, ADA Mastine sought to explain the lineup misidentification by alleging Mr. Broadwater and his counsel manipulated the lineup to "confuse the victim." He argued that it was Mr. Broadwater and his defense counsel who were responsible for ████ ████ failure to identify Plaintiff as the perpetrator.

69.     Plaintiff was unable to explain to the judge in response to ADA Mastine's summation that Defendants had procured ████ ████ identification through improper means because of Defendant Lorenz and Uebelhoer's failure to document or disclose the conversation to ADA Mastine.

70.     In addition to the improperly procured in-court identification, SPD forensic chemist Stephen Kaszubinski testified at trial that he conducted a microscopic hair analysis comparing a "single negroid" pubic hair sample recovered from ████ ████ and a pubic hair sample Plaintiff had voluntarily provided. He then testified that the hair recovered "was consistent as having come from Anthony Broadwater," though he did not testify about how many characteristics the individual hair samples shared.

71.     Research conducted since Mr. Broadwater's conviction—now incorporated into law enforcement policy—has debunked the analysis Kaszubinski conducted. In 2000, the FBI issued a "Forensic Science Communication" recommending that pubic hair analysis consist of "at least 25- full-length hairs taken from different areas of the pubic region."[1] On information and belief, Mr. Kaszubinski analyzed only a single pubic hair from Mr. Broadwater. In 2015, the FBI released a press release stating that "erroneous statements" were made in a stunning 96% of cases (257 of 268) where microscopic hair analysis was used to inculpate a defendant at trial, including 94% of death penalty cases.[2]

72.     Based on ███ ████ identification testimony, which was influenced by Defendants Lorenz and Uebelhoer's undisclosed and undocumented improper conversation with ███ ████, and Kaszubinski's erroneous hair analysis, the court found Mr. Broadwater guilty of rape in the first degree, sodomy in the first degree, sexual abuse in the first degree, robbery in the first degree, robbery in the second degree, assault in the second degree, and assault in the second degree.

73.     The court sentenced Mr. Broadwater to the maximum allowable indeterminate sentence on the top count of rape in the first degree, to run concurrent to the sentences imposed on the remaining convictions.

## VII.    Mr. Broadwater's Pleas of Innocence Throughout His Incarceration

74.     Mr. Broadwater would spend 16 years, 7 months, and 13 days incarcerated on these convictions. His only time outside the prison walls would be for the funerals of his father and uncle.

---

[1] https://archives.fbi.gov/archives/about-us/lab/forensic-science-communications/fsc/july2000/deedric1.htm.
[2] https://www.fbi.gov/news/pressrel/press-releases/fbi-testimony-on-microscopic-hair-analysis-contained-errors-in-at-least-90-percent-of-cases-in-ongoing-review.

75.     Mr. Broadwater has always maintained his innocence—from the investigation, through trial and on appeal, while incarcerated, after his release, and up to today.

76.     He was denied release to parole on at least five occasions because he refused to acknowledge guilt.

77.     He dutifully sought to overturn his conviction on at least five occasions in the decades following his conviction, through pro se submissions and with counsel.

78.     In 1996, the Innocence Project declined to represent Plaintiff after they learned that the Onondaga County District Attorney's Office destroyed the physical evidence from his case, including the rape kit, knife, and ███████ clothing, on February 23, 1988. At that time, the Innocence Project only represented individuals who could be exonerated by DNA, so their representation unfortunately concluded.

79.     Plaintiff also unsuccessfully sought to retain attorney Johnnie Cochran in 1998 by sending him a check for $1,000. Broadwater only made $0.10 to $0.80 cents an hour while incarcerated, but he tried to save as much money as he could to try to get an attorney to help him.

80.     As he fought for his freedom, Mr. Broadwater also had to fight to stay alive. Mr. Broadwater witnessed heinous crimes perpetrated by other incarcerated individuals. Mr. Broadwater witnessed the brutal stabbing death of another incarcerated individual while he was working in the kitchen. Due to the negative stigma of individuals that "snitch," Mr. Broadwater was forced to stay mum when asked about the murder. Mr. Broadwater's refusal to cooperate with the investigation resulted in retaliation.

81.     Mr. Broadwater also felt targeted by correctional officers due to the nature of his conviction and his race.

82.     While incarcerated in mostly maximum-security facilities, Mr. Broadwater was subjected to numerous days of solitary confinement. The days in solitary confinement were physically, mentally, and emotionally exhausting.

**VIII.    "Freedom" As a Level 2 Sex Offender**

83.     Mr. Broadwater was finally released from prison after reaching his maximum conditional release on December 31, 1998. While the New Year is a time of optimism and setting intentions for most people, Mr. Broadwater's New Year as a "free man" came with conditions.

84.     Mr. Broadwater was labeled a Level 2 sex offender and was required to report to a parole officer and to obey any and all conditions mandated by his parole officer. Mr. Broadwater's conditions included: (1) needing permission to leave the State of New York; (2) permitting home and employment visits; (3) seeking written approval to change residences, (4) consent to the search of any of his property since he was still "legally in the custody of the Board of Parole"; (5) making efforts to secure employment notwithstanding the stigmatizing label of "sex offender"; (6) avoiding fraternizing with individuals who have a criminal record; (7) avoiding the excessive use of alcohol; and (8) reporting any and all interactions with law enforcement.

85.     As a Level 2 sex offender, Mr. Broadwater was required to register as a sex offender for life. Every year he had to verify his address and employment. Every three years he had to update his photograph with law enforcement. His name, photograph, exact address, crime of conviction, alleged modus of operation, among other information, was readily available on the internet and could be disseminated by any entity. The publicly available nature of this information limited employment opportunities. He lost several jobs because of it.

IX.    **After Forty Years of Trying to Clear His Name, Mr. Broadwater Finally Wins Vacatur of His Conviction With Support from the Onondaga County DA**

86.    On November 10, 2021, Mr. Broadwater filed a motion to vacate his conviction under New York Criminal Procedure Law 440 based on ████ ████ improperly procured in-court identification as a result of Defendants Lorenz and Uebelhoer's misconduct during his line-up identification procedure, as well as the faulty scientific testimony provided by SPD forensic chemist Kaszubinski

87.    On November 17, 2021, Onondaga County District Attorney William Fitzpatrick, a career prosecutor of more than thirty years, submitted an answering affirmation joining in Mr. Broadwater's motion to vacate his conviction.

88.    On November 22, 2021, the Honorable Gordon J. Cuffy in the New York State Supreme Court, Onondaga County held a hearing on the motion to vacate.

89.    At the hearing, District Attorney Fitzpatrick stated, "I am not going to, you know, sully these proceedings by saying I am sorry. That doesn't cut it. This should never have happened. And I will say to Mr. Broadwater that I assure him that it will never happen again."

90.    After the brief oral argument, Justice Cuffy vacated Mr. Broadwater's conviction and dismissed the indictment against him. As he vacated the conviction, he explicitly stated that "this case involved both an apparently tainted in-court identification and now debunk hair analysis evidence. Each of these seemingly flawed pieces of evidence were the primary foundation of Mr. Broadwater's conviction."

### FIRST CAUSE OF ACTION
### (42 U.S.C. § 1983; Denial of a Fair Trial Against the Individual Defendants Under the Fourth, Fifth, Sixth, and Fourteenth Amendments)

91.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

92.     The Individual Defendants initiated or caused the initiation of criminal proceedings against Plaintiff.

93.     The Individual Defendants created false information and fabricated evidence likely to influence the jury. Their misdeeds include but are not limited to fabrication of ███ ███████ identification of Plaintiff by making false statements to her concerning the lineup procedure, improperly confirming her suspicions that she had picked the wrong person in the lineup, failing to document or memorialize the false statements in a police report or anywhere else, and failing to disclose them to the ADA trying the case.

94.     The Individual Defendants lied to ████████ and concealed their false statements with the express purpose of causing criminal proceedings to be instituted against Plaintiff, even though they could reasonably foresee that their actions would contribute to the decision to prosecute Plaintiff and obtain his conviction and imprisonment.

95.     The Individual Defendants, individually and collectively, manufactured, acted in concert to manufacture, aided and abetted each other to manufacture, and/or conspired to manufacture testimony that they intended to use against Plaintiff in criminal proceedings and/or caused to be used as a basis for Plaintiff's prosecution and conviction.

96.     The Individual Defendants did so knowing that the testimony was false or was highly likely to be false, and/or with deliberate indifference to whether it was true or false.

97.     Without the false or utterly unreliable testimony that the Individual Defendants wrongfully manufactured or knew had been wrongfully manufactured, there would have been no basis to convict Plaintiff for ████████ rape.

98.     Thus, the Individual Defendants knew that they lacked probable cause to initiate criminal proceedings against Plaintiff.

99.     Additionally, prior to Plaintiff's conviction in 1982, and continuing thereafter, the Individual Defendants, acting individually and in concert and conspiracy with one another, covered up, lied to prosecutors about, and withheld knowledge from Plaintiff of *Brady* material.

100.    Defendant Lorenz and John Does 1-5 knew that they had a duty under the United States Constitution to: (a) disclose *Brady* material to the Onondaga County District Attorney's Office so that it could be disclosed to the defense and used to prevent the conviction of Plaintiff based upon false, misleading, or incomplete evidence and argument, and/or (b) make truthful statements to the prosecution concerning the existence of *Brady* material and not to cause or continue Plaintiff's unconstitutional conviction and resultant injuries by concealing such evidence.

101.    Notwithstanding their awareness of these duties, the Individual Defendants, prior to, during, and following Plaintiff's trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed *Brady* material from, lied about, and otherwise failed to disclose *Brady* material to Plaintiff, including ADA Uebelhoer's false and highly suggestive statements to ▇▇ ▇▇ and the existence of several pattern rapes resembling ▇▇ ▇▇ in Thornden Park within the same year.

102.    They did so with the knowledge that their conduct would result in the jury being provided a false or misleading picture of the circumstances surrounding ▇▇ ▇▇ rape, and of the reliability of the police investigation, and would thereby substantially increase the likelihood of a conviction, in violation of Plaintiff's federal constitutional rights.

103.    The aforesaid conduct of the Individual Defendants operated to deprive Plaintiff of his right to a fair trial under the Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

17

104.    The Individual Defendants knew of one another's wrongful acts and displayed deliberate indifference to Plaintiff's constitutional rights by failing to rectify one another's wrongful acts.

**SECOND CAUSE OF ACTION**
**(42 .S.C. § 1983; Malicious Prosecution Against the Individual Defendants)**

105.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as fully set forth herein.

106.    The Individual Defendants initiated, or caused the initiation of, criminal proceedings against Plaintiff.

107.    The Individual Defendants, individually and collectively, manufactured, acted in concert to manufacture, aided and abetted each other to manufacture, and/or conspired to manufacture testimony that they intended to use against Plaintiff in criminal proceedings and/or caused to be used as a basis for Plaintiff's prosecution and conviction—namely, ███ ████ improperly influenced identification of Mr. Broadwater after she identified a different man as the perpetrator in a lineup.

108.    Defendant ADA Uebelhoer falsely stated to ███ ████ that Plaintiff and his defense counsel conspired to use a "friend" at the lineup who is a "dead ringer" for Plaintiff, even though the individual was not Plaintiff's friend and Defendant Uebelhoer noted right before the lineup that this person looked different from Plaintiff.

109.    Defendant Detective Lorenz improperly and in violation of the law confirmed ██ ████ suspicions that she had picked the wrong person in the lineup, did not correct Defendant Uebelhoer's false statements, did not report Ms. Uebelhoer's false statements to anyone, including Mr. Broadwater, his defense counsel, or the trial prosecutor, and did not document or memorialize Ms. Uebelhoer's false statements in his police report or anywhere else.

18

110.    Thus, the Individual Defendants knew that they lacked probable cause to initiate criminal proceedings against Plaintiff.

111.    The indictment was procured by fraud, perjury, and/or misconduct.

112.    Additionally, prior to Plaintiff's conviction in 1982, and continuing thereafter, the Individual Defendants, acting individually and in concert and conspiracy with one another, covered up, lied to prosecutors about, and withheld knowledge from Plaintiff of *Brady* material.

113.    Defendant Lorenz and John Does 1-5 knew that they had a duty under the United States Constitution to: (a) disclose *Brady* material to the Onondaga County District Attorney's Office so that it could be disclosed to the defense and used to prevent the conviction of Plaintiff based upon false, misleading, or incomplete evidence and argument; and/or (b) make truthful statements to the prosecution concerning the existence of *Brady* material and not to cause or continue Plaintiff's unconstitutional conviction and resultant injuries by concealing such evidence.

114.    Notwithstanding their awareness of these duties, the Individual Defendants, prior to, during, and following Plaintiff's trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed *Brady* material from, lied about, and otherwise failed to disclose *Brady* material to Plaintiff, including ADA Uebelhoer's false and highly suggestive statements to ██ ████ and the existence of several pattern rapes resembling ██ ████ in Thornden Park within the same year.

115.    The Individual Defendants acted with actual malice, as demonstrated by, *inter alia*, their decision to falsely manufacture probable cause for Plaintiff's prosecution.

116.    The prosecution terminated in Plaintiff's favor when his conviction was eventually vacated and the indictment against him dismissed on November 22, 2021.

117.    The acts and conduct of the Individual Defendants constitute malicious prosecution in violation of the Fourth Amendment to the United States Constitution.

118.    The Individual Defendants knew of one another's wrongful acts and displayed deliberate indifference to Plaintiff's constitutional rights by failing to rectify one another's wrongful acts.

### THIRD CAUSE OF ACTION
### (Malicious Prosecution Under New York Law Against the Municipal Defendants)

119.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

120.    The Individual Defendants caused the commencement and continuance of criminal proceedings against Plaintiff.

121.    There was no probable cause for criminal proceedings against Plaintiff, and the Individual Defendants knew or should have known as much.

122.    The Individual Defendants acted with actual malice.

123.    The criminal proceedings against Plaintiff terminated in Plaintiff's favor when his convictions were vacated and the indictment against him was dismissed on November 22, 2022.

124.    Defendant County of Onondaga is liable under the doctrine of *respondeat superior* for the unlawful conduct of its employee, Defendant Uebelhoder.

125.    Defendant City of Syracuse is liable under the doctrine of *respondeat superior* for the unlawful conduct of its employee, Defendant Lorenz.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff request that the Court grant the following relief jointly and severally against Defendants

1.    Compensatory damages in an amount to be determined;

20

2. Punitive damages against the Individual Defendants in an amount to be determined;

3. Pre-judgment interest as allowed by law;

4. An order awarding Plaintiff reasonable attorneys' fees, together with the costs and disbursements, pursuant to 42 U.S.C. § 1988 and the inherent powers of the Court; and

5. Such other further relief as the Court deems just and proper.

DATED: November 21, 2022
　　　　Syracuse, New York

Respectfully Submitted,


_____/s_____                                    _____/s_____
**ANDREW G. CELLI, JR.**                    **MELISSA K. SWARTZ**
**EARL S. WARD***                               One Park Place
**MAX SELVER***                                  First Floor
Emery Celli Brinckerhoff Abady          Syracuse, New York  13202
Ward & Maazel LLP                            Telephone:  (315) 424-8326
600 Fifth Avenue, 10th Floor              Fax:  (315) 424-4995
New York, New York 10020                Email:  melissa@cambareribrenneck.com
Telephone: (212) 763-5000
Fax: (212) 763-50001
acelli@ecbawm.com
eward@ecbawm.com
mselver@ecbawm.com

*Admitted in New York. Application for
Admission to the Northern District of New
York forthcoming.


_____/s_____
**J. DAVID HAMMOND**
Carden Dotzler Hammond, PLLC
100 Madison Street
Tower 1, Floor 12

Syracuse, New York 13202
Telephone:  (315) 930-2473
Fax:  (315) 930-2472
Email:  david@lawcdh.com

*Attorneys for Plaintiff*